Good morning, Your Honor. Michael Miller with Michael Schiavelli and Morgan Lucas on behalf of the appellant, Brian Block. May it please the Court, this is a false accounting case where the government has failed to prove the objective falsity of the non-GAAP accounting metrics at issue in this case. And based on that failure of proof, we respectfully submit that Mr. Block should receive a judgment of acquittal on the counts for which he was convicted. At a minimum, we respectfully submit that Mr. Block should receive a new trial. In the middle of the criminal trial back in 2017, the United States Attorney's Office learned from its star witness, Ryan Steele, that Ryan Steele had been offered a share of the SEC whistleblower's whistleblower award. They learned that after Ryan Steele had testified. They learned that after Ryan Steele had offered evidence in this case that nobody else could offer. How would you respond to the view that you have to show that this conversation was material given the other evidence at trial? And you've got the district court saying that Steele was an extraordinarily believable witness at trial. You have Mr. Steele's testimony was corroborated and mostly undisputed by Mr. Block. And the district court also viewed that the government's cross-examination of Mr. Block was, in his words, devastating. So, Your Honor, let me — There's a lot to unpack there. Let me work through that. Not necessarily in the order in which you mentioned it, but it is worth noting that Ryan Steele's testimony was not largely corroborated, not on the key facts. The most important evidence that he offered during the course of the trial is that after the Q2 2014 financial statements were filed, about two or three months later, the audit committee was conducting an investigation. And he alone testified that he had a conversation with Brian Block where the idea of a loan-defeasement-based ad back was created for the first time, where he claims to have expressed to Brian Block that that loan-defeasement theory did not hold water. He claims that he then worked with Brian Block to concoct a cover-up for the audit committee. That was the most compelling testimony that he offered with respect to the guilt of Brian Block, and there is absolutely nobody else who could corroborate that. With respect to the events of July 28th, the Q2 2014 accounting itself, Your Honor, the only other person in the room besides Brian Block and Ryan Steele was Lisa McAllister. Lisa McAllister could not see the computer screen that Brian Block was working on. She could not see the step-by-step, click-by-click process that Ryan Steele alone testified about. Brian Block also described that when he testified, but she had a limited view of the situation, and when asked why she thought that the accounting was wrong, her answer was because Brian Block didn't give an answer, and Ryan Steele seemed to be upset. When all is said and done, the most compelling evidence that Ryan Steele offered and what made him the star singular witness in this case was the evidence about the cover-up. And I should point out that a critical piece of the government's case was that Bill Gribbon, the very man who offered the whistleblower award, came in after we cross-examined Ryan Steele to rehabilitate his credibility, basically came in to testify about conversations that he claimed he'd had with Ryan Steele. And the government never told the Court when the government was asking for permission to call Bill Gribbon to corroborate Ryan Steele, never told the Court that they had heard unambiguously from Ryan Steele and from Ryan Steele's counsel that Bill Gribbon had offered to share the whistleblower award with Ryan Steele. Can I interrupt you there? Yes, Your Honor. What is in the record to indicate that Gribbon offered Steele a portion of the whistleblower award? It seemed to me the only thing in the record about that was a statement by counsel, not by Steele or Gribbon, right? So when the government spoke with Ryan Steele's counsel, according to the declaration prepared by Brian Blaze and corroborated by his two co-counsel, Mr. Gribbon, according to Ryan Steele's counsel, Mr. Gribbon said that he might be able to provide Mr. Steele some portion of his whistleblower award in order to assist Mr. Steele financially. That's what counsel relayed, but did Steele or Gribbon ever say that? So in so then Mr. Blaze interviewed Mr. Steele, and according to Mr. Blaze's declaration, he then corroborated in sum and substance what his counsel had said, and, quote, said Mr. Gribbon said he might be able to assist Mr. Steele financially. So there is a clear alignment between what Mr. Steele's counsel and what Mr. Steele himself said to the government, that the government did not disclose either to the defense or to the court when they were trying to press the court to allow Mr. Gribbon to be a corroborating witness. So was Mr. Steele corroborated? Not on the most important testimony, not by a long shot. A couple of other observations about the court's analysis. The court did testify that Brian Steele at the Rule 33 hearing was forceful and credible. I respectfully submit he lied during the Rule 33 hearing. His testimony at the Rule 33 hearing on the very issue that we're talking about today, his testimony at the Rule 33 hearing was that the offer that Bill Gribbon made to him was one of emotional support. That's not what he told the government in 2017. And for my lights, I'll trust the government's declaration. These guys are professionals. They interview people all the time. They're in the business of remembering what they're told. They got their thoughts together, the ones that flowed through to the declaration, less than a year after the trial. The record is clear that in May of 2018, less than a year after the trial, they got their heads together on exactly what they had heard from Brian Steele. It wasn't until a year later that they submitted declarations, but they got their heads together less than a year after the trial. Their recollection, the judge below said that they were the least reliable source of information. I would respectfully submit that the government declarations were the most reliable. They had no bone to pick. You got to believe that they're trying to be honest and straightforward when they submit their declaration. Ryan Steele and Bill Gribbon, on the other hand, when they testified at the Rule 33 hearing, had every reason to throw curveballs at the court. And you know Ryan Steele did. Ryan Steele testified that he got an offer of emotional support when the record is clear It was an offer of financial support and a share of the whistleblower award. But no dispute that he turned it down. Is that correct? I think there's a huge dispute that he turned it down. What's in the record to indicate that he said yes? Well, a couple of things. First of all, there's the question of do you simply believe Ryan Steele's testimony when you know he lied during the Rule 33 hearing, number one. And number two, keep in mind his explanation for turning down the offer, the offer of emotional support at the Rule 33 hearing, Your Honor. He testified, if you read his actual testimony, he testified to the effect that a financial support wasn't necessary and we shouldn't even go there. Words to that effect. It's in the record on the Rule 33 hearing when he was pressed about how he responded to Bill Gribbon's offer of emotional support. Why would you say that if somebody hadn't actually just put on the table the prospect of financial support? So I think there's every reason to believe, Your Honor, that Ryan Steele, you know, lied about turning down the offer. Now, let's say he didn't lie about turning down the offer. There's every reason to believe that he had it in his head that that was available to him at some point down the road. Did it color his testimony? The jury should have been allowed to decide that. Did it give him a bias to try to convict Brian Block so that he could improve the chances of Bill Gribbon getting a substantial whistleblower award that he might get a share of? The jury was entitled to know that and make that determination, not the government. So for the reasons laid out in our brief, I see I'm out of time. I'm happy to continue to discuss this. Breyer. I just have another question. Yes, Your Honor. You argue, and correct me if I'm misunderstanding, that the government failed to prove that the ARCP's AFFO was objectively false. Correct, Your Honor. But isn't the – I thought that the test is not whether it's necessarily objectively false, but whether it's false or misleading. Yeah. The authority – well, I guess to two things. One is you've got a question of, you know, what is actually, you know, the element of securities fraud? What do they have to prove with respect to the false certification counts? What was it that the parties had to agree to for the conspiracy account? It's a question of, you know, was the underlying statement false? That's the way the government indicted the case. That's the way they presented the case to the jury. Their argument was that the numbers were simply false. And the case law, whether it's Omnicare or Virginia Bank Share, speak directly to the notion that the securities laws do not impose liability merely for the impurities of a director's unclean heart. That's the language in footnote two of Omnicare that cites to Virginia Bank Shares, which cites to Stedman. And the basic concept there, Your Honor, is that, you know, if you look at the totality of the record, the ADBAX derives directly from the interest expense line item in the financial statements of ARCP. The share count, even Ryan Steele testified to this, tied directly back to the books and records of ARCP for Q1 and Q2 of 2014. So they were accurate. We're not here to retry the case about whether, you know, Brian Block did or did not intend to present accurate numbers. We're here to argue on appeal that the government failed to prove that those numbers were objectively false. Thank you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Brian Blaze. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on appeal and also represented the government in the proceedings below. Your Honors, Judge Etkin did not abuse his discretion when he denied Mr. Block's motion for a new trial based on alleged disclosure failures. Judge Etkin appropriately found that there was no reasonable probability that the undisclosed information would have impacted the trial outcome. And although Judge Etkin disagreed on this issue, this Court can also affirm on the grounds that the undisclosed information was, in fact, not impeaching. Well, it certainly would have been impeaching of Gribben, wouldn't it? In that Mr. Gribben was offering a share of the whistleblower award. Wouldn't that be something that would be impeaching of Gribben? Perhaps, Your Honor. So if it were impeachment material that should have been turned over with respect to Gribben, then it would have been fair game to use against Steele, right, in a cross-examination? Of course, Your Honor. Okay. So, I mean, I guess I'm trying to figure out. I mean, it was represented by counsel for Steele that he was offered a share of the whistleblower award, right? Correct. And that's what you indicated when you wrote this down in an affidavit to the Court, right? That's correct, Your Honor. And then you sort of equivocate because you say that in the proffer with Steele, he sort of confirms it was some sort of financial offer. But you don't say whistleblower award. Correct. Do I have that right? That's correct. That is what the declaration says. And I'm not sure I understand, you know, the difference between the two, but — and then at the hearing, Steele says there wasn't any financial offer at all. Right? And, Your Honor, I think if you look at the actual testimony at the hearing, I think that's reconcilable. If you look at the — it's the supplemental appendix, pages 331 to 333, on redirect, Mr. Steele makes clear that he always understood the offer, which in his terms, and he testified at the hearing that it was an offer by Mr. Gribben to, quote, take care of him, that he always understood that to be one of emotional support, but that he speculated to the government when the government asked him if there ever had been a financial arrangement between he and Mr. Gribben, that that conversation in which Mr. Gribben said he would offer to take care of Mr. Steele could be construed as a financial — an offer of financial assistance. So that was Mr. Steele's explanation. Certainly, I think it is not — it is not the case that Mr. Steele lied at the Rule 33 hearing. I think, if anything, the evidence shows that Mr. Steele was trying to answer the government's questions in a deliberate way, and that an offer that he, as he testified at the hearing, construed to be one of emotional support could potentially by someone else be construed to be one of financial support, and explained at the he offered the conversation — he offered the existence of that conversation as an answer to the government's question. Could you help give me some context on this in terms of how this all — this played out? What is it that first led the government to reach out to Steele's counsel on or around June 19th about the Steele-Gribben conversation? Yes, Your Honor. I think the answer to this question isn't specifically in the record, but I think the true answer is an abundance of caution. We were doing a full and complete Jiglio check before putting our witnesses on the stand. We received the answers that we received. We had internal discussion about whether the information that we had received constituted — and, again, this was not a decision made in isolation by the trial team in the heat of battle. This was a decision that was vetted with supervisory personnel at the office. And the conclusion that was reached in good faith was that given that the offer of assistance had been rejected, that there was no agreement or understanding or expectation of any future benefit by the witness — and, in fact, Mr. Gribben himself at the time that we asked the question in the midst of trial did not recall the earlier conversation. We made the good faith — He ultimately did? He ultimately did at the hearing remember the conversation, and he indicated at the hearing that he had been refreshed by reviewing filings in this actual case. So he was refreshed and did recall the conversation. But at the time he was originally asked in the midst of trial, did not recall. And so, Your Honor, in answer to your question, we made a good faith determination that this information was not impeaching and did not need to be — did not need to be disclosed. Because it was rejected? Correct, Your Honor. If it had been explicit, I will give you 15 percent of my whistleblower award. As long as you reject it, your view is it's not impeachment? That is our view, Your Honor. I mean, it's — clearly, if there had been an agreement or understanding, certainly that is impeaching and would have been disclosable. I think it's also our view, had there been an offer that was unresponded to by Mr. Steele that simply remained outstanding, that certainly also is likely impeaching and would have needed to be disclosed. But in this instance, the facts that we had, which was that two and a half years before the trial, at the time before there were any charges, at the time before there was any suggestion of financial assistance that was rejected and, according to our two witnesses, never discussed again, never brought up again, we took the view that that was impeaching. Nonetheless, even if it was impeaching, even if — if — if we violated our Jiglio obligations as a result of not — not disclosing that information, Judge Etkin nonetheless appropriately found that had that information been disclosed, there was no reasonable probability that it would have impacted the result of the trial. And that conclusion is well-supported by — Breyer, that's because of the evidence being overwhelming, in his view, the Court's view. Correct, that the evidence was overwhelming, that the likely impact of the undisclosed information would have been minimal at the trial. And certainly the notion that Mr. Steele was testifying under some — or was fabricating a story about there not being support for this adjustment as a result of some financial incentive is just belied by the evidence at the trial, including evidence of Mr. Steele's own conduct, that, for example, on the night that the adjustment was made, Mr. Steele protested that there was no support for that number. He indicated that he would not deal with any inquiries that came regarding these adjustments. And, in fact, that is what happened. There was evidence from trial that there were both internal inquiries as well as inquiries from ARCP's outside auditor as to why the reported numbers did not tie to ARCP's trial balances. Mr. Steele, as he indicated, would — forwarded those emails on to Ms. McAllister and Mr. Block and didn't deal with those issues. And I think most importantly, the notion that some financial incentive arose as a result of this January or February 2015 conversation, Mr. Steele spoke with the — Mr. Steele spoke with the government on December 19th, 2014. The notes of that discussion with the government are in the record. They're at Confidential Appendix 91 through 127. There's a 27-page 302 recorded by the FBI of every statement that Mr. Steele made in that December 2014 meeting, and it is entirely consistent with the testimony that he gave at trial. Information that he provided to the government before any financial incentive as a result of this purported — or as a result of this offer of assistance for Mr. Gribben arose. So had the impeaching information actually come in at trial? I think, as Judge Etkin recognized, the government had a very powerful response, not just pointing to Mr. Steele's conduct that was consistent with there being a fraud on the night of July 28th, but the fact that before the incentive arose, he told the government — or provided the government information that was entirely consistent with his trial testimony, and we would have been able to introduce that information as a prior consistent statement. Just — One thing with respect to the Gribben-Steele conversation, one is left with a sense that the whole truth has not been disclosed, that is, as between what was said in those conversations, because there is a — there is obviously a change. You can try to reconcile them in some way, but there's something when one reads the account that — one is left with a sense that something is missing in terms of the full explanation. Well, of course, Your Honor, the government had to make its disclosure decision in June of 2017 based on the information that was available to the government in June of 2017. We certainly didn't have the evidentiary hearing testimony in November of 2018 at the time we were making our original decision. You know, we do believe that the testimony — that Mr. Steele's testimony is reconcilable. Judge Etkin, in his opinion, recognized that there may be, quote, less than meets the eye with respect to the purported inconsistencies in Mr. Steele's testimony. And, you know, Judge Etkin was obviously the trial judge in this matter and sat as the — as the judge in the evidentiary hearing, had a view, said that Ryan Steele was an extraordinarily credible witness. So given that, we believe that Judge Etkin's conclusions were appropriate and supportable by the record. Thank you, Your Honor. You would agree, though, that if there were something there, that it would be inappropriate for the government not to turn in — not to report this in some way as a bradio-giglio material? If there had been an agreement? Of course, Your Honor. We don't dispute that. Had there been an agreement or an understanding about a provision of a future post-testimonial benefit, that we would have been obligated to disclose that under giglio. The evidence that we had at the time that we made the disclosure decision was that there was no such agreement. That was — that was information provided to us by both Mr. Steele and Mr. Gribben, and we made the decision in light of that information not to make the disclosure. Were there contemporaneous notes of the conversations with Steele and Gribben? We did not take notes of the conversations at that time. In the same way that we often — Why not? In the same way that we — I'm just asking. Yeah. In the same way that we often do not record negative responses to giglio questions, if we ask a witness, have you ever murdered anyone? Have you ever, you know, traded child pornography? And the answer to those questions is no. We don't have an obligation to record the — record and disclose the nonexistence of giglio information. Having made the conclusion here that the information was not impeaching, we also made the conclusion, or reached the conclusion, that it was not necessary to memorialize it. I see that my time has expired.  Thank you. Your Honor, the only — the only reason why the government can get up here and tell you that the offer was rejected is because within the confines of the U.S. Attorney's Office, they decided that they wanted to believe what their witness said to them. That's the only reason. That's the only reason. That is a credibility determination that the government should not be allowed to make. That is a credibility determination that a jury should be allowed to make. And they denied the jury that possibility, and they denied us the ability to cross-examine both Ryan Steele and Bill Gribbon. Can you imagine what would have — It's not for the — so when the judge, in the end, in his additional opinion, tried to reconcile these conversations — That's the jury's job. That's the jury's job, in your view. Absolutely, that's the jury's job. And I don't know how you reconcile these statements. You know, and I will say that as a broad proposition, what I think I hear the financial support to the government's star witness is not Brady. That can't be true. That isn't what the case law says. That's not the kind of way the Brady and Giglio case law has evolved. Offers, hopes, expectations, you know, motivation to lie, those are the kinds of things — Sure, an agreement is great, but all of those other things can form the basis for a Brady violation. And if that is the government's view, God help us. God help us. They should have to turn that over. And if they had, I am telling you — by the way, I don't know if I mentioned it, but I was trial counsel. It would have made — that might have come through, Your Honor. That would have been a game-changer. It just — I have 11 seconds, so let me just say the following. Ryan Steele was the government's star witness. Ryan Steele did say things that nobody else said that went to the heart of the government's case. Ryan Steele held himself out as a Boy Scout. He said his only reason for testifying is he wanted to tell the truth. He could not sleep at night, he told the jury. And that's what the government said to the jury. They said his stomach hurt. He couldn't sleep at night. He had to tell the truth. That's why he came in. And they said those things to the jury knowing that the whistleblower award had been offered to share that whistleblower award by the very witness they called to corroborate Ryan Steele. The very witness. And in the summation, they point to that testimony. And they say, you know how you can tell Ryan Steele is telling the truth? Bill Gribben. They do that in the summation. And they know that they had a conversation. I'm sorry to get so animated, but it is a powerful case of a serious — What is the response to Judge Etkin's point, which Mr. Blais just echoed, that the timing of the — of Steele's first statements to the government predates this alleged offer? I think it's a great point and one for which there's a really interesting answer. I think the answer is that the jury would have learned, as we did during the Rule 33 hearing, that before that first interview, Bill Gribben and Ryan Steele rejoined at the hip. There's a lot of testimony in the Rule 33 hearing about conversations about the accounting, the Grant Thornton work, the audit committee investigation, the SEC investigation, the government investigation. Do you know — I mean, the record is clear that the only reason Ryan Steele got in to see the government in December of 2014 is because Bill Gribben asked the government to speak with them, and he did that because Ryan Steele asked him to. They rejoined at the hip. And the record is clear. There are three indisputable facts that Ryan Steele knew before he met with the government. He knew Bill Gribben had filed a whistleblower award. He knew Bill Gribben's whistleblower award turned on the AFFO information that he shared with Bill Gribben. He knew that from Bill Gribben. And he knew Bill Gribben was in line to get an AFF — I'm sorry, a whistleblower award. So the jury could have heard everything that Brian Blais just told you about and said, so what? It is clear that those two rejoined at the hip and had a motive to cook up a story. The joint at the hip line of Cross was available throughout the trial. Your Honor, we just had no clue. We had no clue that there had been any discussion between the two of them about sharing. The only thing you didn't have available to you was the conversation in which an alleged offer of financial assistance was made. But the other things you just talked about, those were all fair game for Cross and available to you, right? There was nothing in — obviously, fair question. There was nothing in the 3500 material, as I sit here today and as I recall, nothing in the 3500 material that shed any light that suggested for even a moment that Bill Gribben and Ryan Steele had discussed the fact that Bill Gribben's AFFO — I'm sorry, whistleblower application included AFFO information from Ryan Steele and that Bill Gribben was potentially in line for a whistleblower award. They're just — you know, clearly, we could cross-examine Bill Gribben about his financial interests, but there was nothing to suggest that Ryan Steele was anywhere close to potentially having an interest in that. That all came out in the Rule 33 hearing. This trial would have ended differently if that information had been available. Thank you, Your Honor. Roberts. Thank you both for your arguments. The Court will reserve decision.